IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| EDWARD LEWIS SCHWENK, SR. and | * | CHAPTER 7 |
| RO SCHWENK, a/k/a RO DOYLE, | * | |
| Debtors | * | |
| | * | CASE NO. 1:08-bk-03055MDF |
| ROBERTA A. DeANGELIS, | * | |
| ACTING UNITED STATES TRUSTEE, | * | |
| Movant | * | |
| | * | |
| v. | * | |
| | * | |
| EDWARD LEWIS SCHWENK, SR. and | * | |
| RO SCHWENK, a/k/a RO DOYLE, | * | |
| Respondent | * | |

**OPINION**

Before me is the motion of the United States Trustee ("UST") to dismiss the chapter 7 bankruptcy case of Edward and Ro Schwenk ("Debtors"). Invoking 11 U.S.C. § 707(b)(3) as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 ("BAPCPA"), the UST alleges that this case should be dismissed because it was filed in bad faith and because under the totality of the circumstances, the filing is an abuse of chapter 7. For the reasons set forth below, the UST's motion will be granted.

**Procedural History**

Debtors filed their bankruptcy petition on August 26, 2008 and Schedule "I" (income) and Schedule "J" (expenses) on September 5, 2008. They amended Schedules "I" and "J" twice thereafter, filing their final schedules on October 29, 2008.[1] The UST moved to dismiss the case

---

[1] Due to the fluidity of Debtors' financial situation, even their twice-amended schedules did not accurately reflect their actual income and expenses on the date of the hearing. In the Factual Findings below, the information provided in the schedules was adjusted based upon the testimony provided at the hearing.

on December 5, 2008, to which Debtors filed an objection. A hearing was held on January 12, 2009. The matter is ready for decision.[2]

## Factual Findings

Debtors are a married couple who resided in Seven Valleys, Pennsylvania during the 180-day period before they filed their bankruptcy petition. Although no testimony was provided about Debtors' ages, Edward Schwenk ("Edward") was employed by the federal government until he retired in August 2008. Ro Schwenk ("Ro"), Edward's wife, had been employed as a clinical assistant at a dental practice in York, Pennsylvania until Debtors relocated to Sunset Beach, North Carolina on August 14, 2008. She voluntarily terminated her job in Pennsylvania and was unemployed on the hearing date. Debtors have no dependents.

Edward testified that he retired because he no longer would be permitted to work overtime, which significantly reduced his monthly income. He also concluded that continuing to work at his base pay would not increase his monthly pension income when he retired, so he opted to retire immediately. As part of his retirement package, Edward received a lump sum, after taxes, of approximately $11,000.00 as compensation for unused sick leave. No portion of this sum was used to reduce existing debt, instead most of the funds were used to defray costs associated with Debtors' relocation to Sunset Beach.[3]

---

[2]I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A). This Opinion constitutes findings of fact and conclusions of law required to be made by Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

[3]Edward estimated that from this $11,000.00, they expended $1,400.00 to repair a vehicle, $1,400.00 for their first month's rent in Sunset Beach, $6,000.00 for moving expenses, $400.00 for renters' insurance, and $400 for North Carolina motor vehicle taxes and tags. (N.T. 48 - 49).

2

*a.     Calculation of Debtors' actual net monthly income*

Having substituted a rental unit in place of their mortgaged home, Debtors no longer will be able to claim deductions for mortgage interest or for state and local real estate taxes on their federal income return.[4] Debtors assert that with the loss of these deductions they will be forced to use the standard deduction and, accordingly, will not receive significant tax refunds in the future. Therefore, the annual tax refund that was amortized at $678.59 a month on Schedule "I" will not be available as a source of income in the future. No evidence rebutting this assertion was introduced by the UST. Thus, for purposes of the Discussion below, I will assume that Debtors' monthly income in the future will not include a tax refund.

In the first Schedule "I" Debtors filed with the Court, they reported that their gross income consisted of Edward's monthly pension of $4,860.61 and Ro's net monthly wages of $1,760.62. In their Second Amended Schedule "I," prepared using the information available after they moved to North Carolina, Debtors reported that Edward's monthly pension was $4,392.00 and his monthly Social Security payment was $450.00.[5] Edward's monthly pension income was lower in the revised schedule because Edward purchased a survivor benefit for Ro so that she could continue to receive a portion of his federal pension in the event that he predeceased her. To pay for this benefit, $468.00 is deducted from Edward's gross monthly pension payment of

---

[4]By Order entered on October 21, 2008, Countrywide Home Loans, Inc., the servicer of the mortgage against the Seven Valleys residence, obtained relief from the automatic stay so that foreclosure proceedings could commence against the property. The motion for relief from the stay, to which Debtors did not respond, alleged that Debtors had failed to tender their regular mortgage payment of $3,515.69 for the months of March through September 2008, inclusive. No evidence was presented that Debtors intend to purchase a home in North Carolina.

[5]On Schedule "I," Debtors reported that Edward's monthly Social Security payment was $450.00. However, at the hearing Edward testified that the correct payment amount is $435.00. (N.T. 29).

$4,860.61. As I will discuss below, Edward's purchase of this benefit is unjustified and, therefore, the benefit payment will be "added back" when calculating Debtors' monthly income for purposes of this case.

After the following additional items are deducted from Edward's monthly pension payment he is left with net monthly pension income of $3,983.40:

| | | |
|---|---|---|
| $4,860.61 | | Gross monthly pension payment |
| $ (314.47) | | health insurance (Blue Cross/Blue Shield) premiums |
| $ (406.44) | | federal income tax |
| $ (112.88) | | dental insurance |
| $ ( 43.42) | | vision insurance |
| $3,983.40 | | Net monthly pension payment |

Thus, if I assume that Debtors will receive no federal income tax refund in future years and that Ro will not obtain employment, Debtors' joint net monthly income going forward will consist of a pension payment of $3,983.40 and a monthly Social Security benefit of $435.00 for a total monthly amount of $4,318.40.

      b.    *Calculation of Debtors' monthly expenses*

Debtors' initial Schedule "J" and final Schedule "J" include the following expenses:

| | INITIAL | FINAL |
|---|---|---|
| Mortgage/rent | $3,411.55 | $1,395.00 |
| Electricity and heating fuel | $ 600.00 | $ 150.00 |
| Water and sewer | $ 65.00 | $ 55.00 |
| Telephone | $ 125.00 | $ 30.00 |
| Other | $ 195.00 | $ 125.00 |
| Home maintenance | $ 100.00 | $ 30.00 |
| Food | $ 500.00 | $ 600.00 |
| Clothing | $ -0- | $ 50.00 |
| Laundry and dry cleaning | $ -0- | $ 30.00 |
| Medical and dental | $ 100.00 | $ 120.00 |
| Transportation | $ 300.00 | $ 200.00 |
| Recreation | $ 100.00 | $ 100.00 |
| Charitable contributions | $ -0- | $ 100.00 |
| Taxes | $1,210.61 | $ 750.00 |
| Second Mortgage | $1,280.89 | $ -0- |

| | | |
|---|---|---|
| Pet care | $ 40.00 | $ 40.00 |
| Personal | $ 100.00 | $ 100.00 |
| Time share | $ - 0- | $ 87.28 |
| Time share maintenance | $ -0- | $ 20.83 |
| Student loans | $ -0- | $ 170.00 |
| Storage unit | $ -0- | $ 90.00 |
| TOTAL EXPENSES | $8,608.05 | $4,759.02 |

As of the date of the hearing, Debtors had surrendered their time share and, therefore, no longer were incurring expenses related to purchasing or maintaining this asset. When they moved to their smaller living quarters in North Carolina, Debtors put some of their furniture in storage because they did not have space for all of their items. Later, Edward gave the furniture to his son and his son's fiancé, which allowed Debtors to forego the monthly rental expense for the storage unit. (N.T. 18). After eliminating these expenditures, Debtors' actual monthly expenses are $4,560.91. Deducting the revised expense amount of $4,560.91 from Debtors' anticipated net monthly income of $4,318.40 produces a monthly shortfall of $242.51. Therefore, at the date of the hearing, Debtors did not have disposable income available to devote to a chapter 13 plan.

Debtors' Schedule "F" reports total unsecured, nonpriority debt of $34,451.85. Of this sum, $11,210.85 (32%) is attributable to a non-dischargeable student loan debt that Ro incurred in the spring of 2006 while pursuing medical assistant training.

## Discussion

Section 707(b)(3) of title 11 requires a bankruptcy court to dismiss a chapter 7 case if granting relief would constitute an abuse of the provisions of chapter 7. In relevant part, § 707(b)(3) states that:

> (3) In considering . . . whether the granting of relief would be an abuse of the provisions of this chapter . . . the court shall consider –
>
> **(A)** whether the debtor filed the petition in bad faith; or

5

Case 1:08-bk-03055-MDF    Doc 31    Filed 04/10/09    Entered 04/10/09 12:53:09    Desc
Main Document      Page 5 of 15

> **(B)** [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

11 U.S.C.A. § 707(b)(3).

The UST bears the burden of proving by a preponderance of the evidence that the filing of the petition constitutes abuse. *In re Miller*, 335 B.R. 335 (Bankr. E.D. Pa. 2005); *In re Colgate*, 370 B.R 50 (Bankr. E.D. N.Y. 2007). In support of its motion in the within case, the UST offers evidence both of bad faith under § 707(b)(3)(A) and of an ability to pay debt under § 707(b)(3)(B), which is one component of the totality of the circumstances test.

    *a.*    *Bad faith under § 707(b)(3)(A)*

A few weeks before Debtors' filed their chapter 7 petition, Edward retired, Ro quit her job, and Debtors expended a considerable sum of cash to move from their suburban Pennsylvania home to a rental unit in a North Carolina beach town. The UST suggests that this sequence of events demonstrates that Debtors' petition was filed in bad faith. According to the UST, Debtors filed their bankruptcy petition to enable the couple to retire free of debt, using the lump sum payment Edward received shortly after he retired to further this scheme. Rather than cutting back on expenses and using the lump sum to satisfy the claims of creditors, Debtors voluntarily reduced their income and used the windfall to finance their move to a more desirable climate.

    *1.*    *Edward's retirement*

Edward testified that he retired because he was no longer permitted to work overtime to supplement his base pay and working longer would not increase the monthly amount that he would receive through his pension. Debtors report on Form 22A that Edward's average monthly income for the six calendar months prior to the filing of the bankruptcy case was $7,401.29. No

6

evidence was introduced, however, of the pay Edward would have received if he had remained employed at his base salary. Notably, the UST has not asserted that Edward's decision to retire was made in bad faith, although this decision reduced his income by more than 40 percent. Therefore, I will not consider the reduction in income or the timing of Edward's decision to retire as an indicator of bad faith.

### 2. *Ro's voluntary termination of employment*

Ro's decision to quit her job so that Debtors could move to North Carolina reduced Debtors' monthly income by $1,760.62. However, because the relocation enabled Debtors to reduce their expenses as well as their income, there was no net adverse impact on Debtors' monthly bottom line. Debtor's monthly budget actually improved by $255.93 as an indirect result of Ro's voluntary termination of her employment. The UST argues that although eliminating their first and second mortgages enabled Debtors to significantly reduce their expenses, the benefit of these reduced expenses could have inured to the benefit of Debtors' creditors, rather than Debtors, if they had moved into less expensive housing in the York area and Ro had continued to work.

### 3. *Debtors' eve-of-bankruptcy expenditures*

Debtors do not contest that the payout on Edward's accumulated leave provided a substantial cash windfall on the eve of bankruptcy. Further, they do not dispute that the funds could have been used to reduce their outstanding debt. They agree that, although they were aware that these funds could have been used to pay their creditors, they opted to use Edward's lump sum payment to finance their relocation to North Carolina.[6]

---

[6]I acknowledge that Debtors would have incurred some expenses related to moving because they could not continue to make mortgage payments of $3,411.55 a month after Edward retired. However, it is reasonable to assume that their expenses would have been significantly

7

At least one bankruptcy court has found evidence of bad faith when a debtor uses a windfall shortly prior to his chapter 7 filing to make unnecessary purchases rather than paying down debt. In *In re James*, 345 B.R. 664 (Bankr. N.D. Iowa 2006), the debtor received employment-related bonuses totaling $13,160.00 a few months before he filed his chapter 7 petition. Instead of applying these funds to paying down his total unsecured debts of $24,165.22, James purchased a variety of unnecessary consumer items, such as a new kennel for his dog and trip to a professional football game.[7] *Id.* 345 B.R. at 666. The Court found that these actions demonstrated a "lack of honesty of purpose or fair dealing," providing evidence of bad faith. *Id.* Based on these findings the Court sustained the 707(b) motion and dismissed the case.

As my findings above indicate, the instant Debtors and the debtor in *In re James* reported similar levels of unsecured debt and spent similar sums on other expenditures that otherwise could have been devoted to debt reduction. A notable distinction between the cases, however, is that although Debtors could have used the lump sum payment to pay creditors, at least the funds were used to lower Debtors' monthly living expenses. In contrast, the expenditures of the debtor in *In re James* were frivolous and failed to improve his financial situation.

The UST argues that instead of spending $11,000.00 to relocate to North Carolina, Debtors could have acquired less expensive housing locally, enabling Ro to keep her position as a dental assistant. If Debtors had remained in Pennsylvania, they would have enjoyed a monthly income of $6,079.02 because Ro's monthly pay of $1,760.62 would have supplemented Edward's monthly pension and Social Security benefits of $4,318.40. Edward attempted to

---

less if they had obtained alternative housing in the community where they were living and Ro was employed.

[7]His other purchases included a black powder rifle, a bowling ball and bag, hunting boots, a snowblower, and a new washing machine and dryer. *Id.* 345 B.R. at 666.

discount the loss of Ro's income by explaining that living expenses were lower in North Carolina. However, he did not quantify this representation or provide evidence that the loss of income was offset by a concomitant reduction in expenses. Even if Debtors' expenses were $500.00 a month higher in Pennsylvania, Debtors would have had approximately $1,000.00 a month in disposable income to devote to a chapter 13 plan, which would allow them to pay off all of their unsecured debt in less than three years.

In *In re Manske*, 315 B.R. 838 (Bankr. E.D. Wis. 2004), joint debtors in a chapter 7 case both voluntarily resigned from their jobs in Wisconsin, moved to Tennessee, and three months later filed for bankruptcy. The debtors testified that the decision to move was prompted by the desire of the debtor-wife to care for her elderly mother. The bankruptcy court, unmoved by the debtors' explanation, sustained the UST's motion to dismiss, finding that the debtors were "knowingly . . . taking an unfair advantage of their creditors. Had they remained in Wisconsin and kept their jobs, they easily would have had the ability . . . to fund a chapter 13 plan and provide their creditors with a substantial dividend." *Id.* 315 B.R. at 844.

Similarly, in the instant case, Debtors have demonstrated no compelling reason for their decision to relocate to North Carolina. Debtors did not suggest, for example, that Ro had greater employment opportunities in North Carolina, or that their health required relocation to a more temperate climate. Although Edward stated that he has arthritis, there is no evidence in the record to demonstrate that the move was prompted by health concerns. In short, Debtors' move was prompted by their desire to pursue a different lifestyle, a lifestyle financed by Debtors' creditors.[8]

---

[8]I do not suggest in this opinion that a debtor's decision to move to another part of the country is indicative, per se, of bad faith. To the contrary, a debtor's refusal to consider relocation in order to obtain employment that would enable a debtor to pay his or her debts may be evidence of bad faith. *See In re Richie*, 353 B.R. 569 (Bankr. E.D. Wis. 2006) (debtor abused

9

Rather than cut expenses in order to pay down debt, Debtors chose to reduce their income so that they could adopt a more agreeable lifestyle. Further, when Edward elected to retire and live on his pension, he used the lump sum leave reimbursement not to satisfy creditor claims, but to finance Debtors' new living arrangement. I find that these actions constitute bad faith and that the petition is subject to dismissal on these grounds.

    b. *Totality of the circumstances under § 707(b)(3)(B)*

In addition to alleging bad faith, the UST also asserts that Debtors' case should be dismissed under the totality of the circumstances. Specifically, the UST alleges that Debtors have sufficient monthly disposable income to permit them to pay a substantial amount of their unsecured debt. As I have discussed above, an analysis of Debtors' current income and expenses (assuming that Ro is unable to find employment in North Carolina) does not support the UST's allegation that Debtors have an ability to pay their debts out of future income. As of the date of the hearing , Debtors were living on Edward's income, which is insufficient to cover their anticipated reasonable and necessary expenses. Therefore, it is appropriate to disregard the "ability to pay" factor for purposes of examining the totality of the circumstances in this case.

In *In re Miller,* 302 B.R. 495 (Bankr. M.D. Pa. 2003), I adopted the "hybrid approach" to analyze the totality of the circumstances under § 707(b) used by the Sixth Circuit in *In re Krohn,* 886 F.2d 123, 126 (6th Cir. 1988) as supplemented by additional factors considered by the Fourth Circuit in *In re Green*, 934 F.2d 568 (4th Cir. 1991). I have determined that it is appropriate to consider the same factors when a motion to dismiss for abuse under § 707(b)(3) is considered in

---

chapter 7 who lacked ability to pay creditors only because of an unwillingness to relocate from southern Wisconsin or to work outside chosen profession). My finding that Debtors' decision to move to North Carolina is indicative of bad faith is based on the particular facts of this case.

a case filed after the enactment of BAPCPA. *See In re Hoffman*, 2008 WL 5158292, *3 (Bankr. M.D. Pa. 2008). These factors include the following: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in bad faith;[9] (6) whether the debtor had engaged in eve of bankruptcy purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities. *In re Hoffman*, 2008 WL 5158292 at *3 (Bankr. M.D. Pa. 2008).

> 1. *Whether the bankruptcy petition was filed because of sudden illness, calamity. disability, or unemployment*

Debtors' petition was not filed because of sudden illness, disability or other similar calamity. Debtors filed their petition after Debtors voluntarily chose to reduce their income as well as their monthly expenses.

---

[9]One of the factors considered in the totality of the circumstances analysis under the *Krohn* test is whether the petition was filed in bad faith. Because under BAPCPA a case may now be dismissed on bad faith alone under § 707(b)(3)(A), the totality of the circumstances analysis will be applied most often in cases in which evidence of bad faith either is not present or is a minor factor.

11

Case 1:08-bk-03055-MDF    Doc 31    Filed 04/10/09    Entered 04/10/09 12:53:09    Desc
Main Document    Page 11 of 15

*2. Whether debtors made consumer purchases far in excess of their ability to repay*

In the instant case, Debtors did not use their credit cards to make consumer purchases the value of which exceeded their annual income. Debtors' Schedule "F" states that Debtors accumulated $34,451.85 in unsecured, nonpriority debts since November 2005. In 2006, Debtors' gross income was $100,886.00. In 2007 it was $128,233.00. Thus, their unsecured debt on the date of the petition was only 15% of their total income ($229,119.00) for the two calendar years (2006 and 2007) in which they carried that debt before filing their petition. I do not find this to be an amount "far in excess of their ability to repay."

Of the total debt listed in Schedule "F," $11,210.85 (32%) is attributable to student loans that Ro obtained in the spring of 2006 to pursue a degree as a medical assistant. Student loan debts are generally not dischargeable absent a showing by the debtor of undue hardship under 11 U.S.C. § 523(a)(8). Thus, Debtors would be liable for $11,210.85 in unsecured debt even if they were to be granted a chapter 7 discharge. Most of the remaining $23,241.00 in unsecured, nonpriority debt owed by Debtors is attributable to credit card purchases.[10] Again, none of these expenditures suggest that Debtors used unsecured debt to make consumer purchases far in excess of their ability to pay.

*3. Whether debtors' proposed family budget is excessive or unreasonable*

Debtors' expenses disclosed in Schedule "J" generally appear to be necessary and reasonable. However, in Debtors' amended Schedule "I," they report that after the petition was

---

[10]Schedule "F" lists a joint debt to Navy Federal Credit Union in the amount of $18,169.73 along with a debt to Reed's Jewelers of $2,370.00 for purchases made in December 2005. The four remaining debts listed on Debtors' Schedule "F" include a utility bill ($655.94), and three claims for medical services totaling $2,045.33.

12

filed, Edward's monthly pension payment was reduced because Edward arranged for $468.00 to be deducted from his monthly payment in order to purchase a "survivors' benefit" for Ro. Edward testified that this expenditure will enable his wife to continue to receive a portion of his federal pension in the event that he predeceases her. Courts generally have found similar expenses to be unreasonable in a § 707(b) context. *See In re Leung*, 311 B.R. 626 (Bankr. S.D. Fla. 2004) (sum deducted from paycheck toward life insurance was not "reasonably necessary" for debtor's support, and thus was "disposable income" for § 707(b) purposes). *Accord In re Woodward,* 265 B.R. 179 (Bankr. S.D. Iowa 2001) (lump sum expended in year before bankruptcy to purchase survivor benefit for debtor's wife was unreasonable when wife was employable and could support herself). *In re DeRosear*, 265 B.R. 196 (Bankr. S.D. Iowa 2001); *In re Katz*, 203 B.R. 227 (Bankr. E.D. Pa. 1996); *In re Vianese*, 192 B.R. 61 (Bankr. N.D. N.Y. 1996); *In re Smith*, 187 B.R. 678 (Bankr. D. Idaho 1995). Therefore, I conclude that it is indicative of abuse for Edward to reduce his income in order to provide for a future benefit to Ro in the absence of any evidence that she will be unable to provide for her own support.

> 4. *Whether debtors' schedules and statements of current income and expenditures reasonably and accurately reflect debtor's true financial condition*

Debtors admit that their schedules do not reasonably and accurately reflect their true financial condition. For example, on Schedule "I" Debtors report $678.59 in monthly income that they do not anticipate receiving in the future. This inaccuracy, however, does not demonstrate that Debtors were not forthcoming with the Court, but simply provides full disclosure of income that was received in the past.

13

Case 1:08-bk-03055-MDF    Doc 31    Filed 04/10/09    Entered 04/10/09 12:53:09    Desc
Main Document      Page 13 of 15

> 5. *Whether the debtors engaged in eve of bankruptcy purchases*

Except for the purchases and expenditures that accompanied their relocation to North Carolina, Debtors do not appear to have engaged in any eve of bankruptcy purchases. No such purchases are apparent on Schedules "D" or "F."

> 6. *Whether the debtors enjoy a stable source of future income*

With Edward's federal pension and Social Security benefits, Debtors enjoy a stable source of future income. The testimony indicated that this income may be supplemented in the future if Ro is successful in finding employment in North Carolina.

> 7. *Whether the debtors are eligible for adjustment of their debts through chapter 13*

Debtor is eligible to be a debtor under chapter 13 pursuant to 11 U.S.C. § 109(e).

> 8. *Whether the debtors' expenses can be reduced significantly without depriving them of adequate food, clothing, shelter and other necessities*

Debtors' monthly expenses as listed on Schedule "J" generally appear to be reasonable and necessary for Debtors' support. In fact, Debtors have significantly reduced their expenditures post petition by reducing their housing costs and by eliminating expenses related to the time share they previously owned.

> 9. *Other factors*

There is no information present in the record to determine whether there are state remedies that might ease Debtors' financial predicament or if Debtors may obtain relief through private negotiations.

Other than the post-petition deduction to provide for a survivors' benefit to Ro, there are no factors in the totality of the circumstances analysis that strongly suggests that the case should be dismissed under § 707(b)(3)(B).

14

## Conclusion

A bankruptcy court may dismiss a case for abuse under 11 U.S.C. § 707(b)(3) either because the case was filed in bad faith or if under the totality of the circumstances a debtor's financial situation demonstrates abuse. Although Debtors' financial circumstances under the *Krohn/Green* test do not suggest abuse, I find that the petition was filed in bad faith. Debtors incurred substantial debt on the eve of bankruptcy by relocating to North Carolina rather than paying down their debt. In addition, they chose to use funds that otherwise would have been available to pay creditors to finance their move. Their decision to relocate also caused Ro to become unemployed and, thus, further hampers Debtors' ability to satisfy the claims of creditors. If these actions had not been taken Debtors would have been able to repay their debts in a relatively short time. Accordingly, I find that the filing of Debtors' case was an abuse of chapter 7 and, therefore, the case will be dismissed under § 707(b)(3)(A) unless Debtors opt to convert to chapter 13 within ten (10) days of the date of the Order entered in accordance with this Opinion.

By the Court,

Mary D. France
Bankruptcy Judge

Date: April 10, 2009

*This document is electronically signed and filed on the same date.*